WISE, Presiding Judge.
 

 On September 21, 2005, the appellant, Jamal Adarius McCain, entered a guilty plea to first-degree robbery. The trial court sentenced him to serve a term of
 
 *644
 
 twenty years in prison, but split the sentence and ordered him to serve three years followed by three years on supervised probation. Revocation proceedings were initiated in June 2008. After conducting a revocation hearing, the circuit court revoked McCain’s probation. This appeal followed.
 

 Leslie Koepp testified that she was a probation parole supervisor; that June 11, 2008, was McCain’s time to report for his monthly visit with his probation officer and pay his supervision fees; and that, on that date, the clerk at the fee unit notified her that a possible counterfeit one hundred dollar bill had been presented to pay McCain’s probation fee. She also testified that all bills presented for payment are checked with counterfeit detection; that, if a bill turns black, it is counterfeit; that the one hundred dollar bill turned black; that she confiscated the one hundred dollar bill and told McCain he could go back to see his probation officer, but to have a seat in the lobby when he finished; that she told McCain he could not leave the building until after he had talked to her or Officer Langer; that she left the fee unit and went to call the United States Secret Service; and that, by the time Agent Stephen Lewis of the Secret Service arrived, McCain had left. Koepp testified that she telephoned McCain’s family members on two occasions to get McCain to come back to the probation office; that, between fifteen and twenty minutes later, McCain returned to the office; and that Lewis interviewed McCain. She further testified that she questioned McCain about his drug use; that McCain told her he had been smoking marijuana while he was in the custody of the Alabama Department of Corrections (“ADOC”); that McCain told her he had last smoked marijuana on June 10, 2008; and that McCain told her he would test positive if he was tested for drug use.
 

 Stephen Lewis testified that, on June 11, 2008, Koepp telephoned him and told him she had a suspected counterfeit bill and wanted him to verify it; that he went to the probation office and met with Koepp; and that he looked at the bill and determined that it was counterfeit. He also testified that he questioned McCain after he returned to the probation office; that, originally, McCain denied any knowledge about the counterfeit bill; that he continued to question McCain; that, eventually, McCain told him he had gotten the bill from a man he had passed while walking to a gas station; and that McCain told him that the man wanted to change the bill for some money, that they exchanged bills, and that that was it. Lewis further testified that he knew McCain was not telling the truth; that, after he continued to question McCain, his story began to change; that, between one and one and one-half hours later, McCain told him he had gotten the bill the night before from a man who had cut his grass; and that McCain told him that he and his girlfriend, Tameka Green, looked at the bill, that the bill looked funny, and that they thought it could be counterfeit. Finally, Lewis testified that he also talked to Green; that Green’s story basically matched McCain’s; and that Green said that she and McCain both thought the bill looked funny.
 

 Tameka Green testified that McCain was her boyfriend; that, on the evening of June 10, 2008, someone knocked on the door of their residence, and McCain went to the door; that she later went outside; that McCain and a man who had cut their grass before were outside; that the man asked McCain to change a one hundred dollar bill for him; that the man had not cut their grass that night; that McCain asked her to get some money off of the dresser, and she did; that McCain exchanged a ten dollar bill and some twenty dollar bills for the one hundred dollar bill;
 
 *645
 
 and that she went back into the house. She also testified that McCain looked at the bill and held it up; that he told her the bill looked funny; that she said she thought the bill was real and that it looked real; that McCain agreed that it looked real; and that they left it at that. Green further testified that, on June 11, 2008, she talked to Lewis; that he asked her about the bill; and that she told Lewis that McCain had looked at the bill, that the bill looked to be real, and that she thought the bill was real.
 

 Taneisha McCain testified that she was McCain’s sister; that, on June 11, 2008, she took McCain to the probation office; that she waited outside; that it took longer than usual; that McCain came outside, and they left; that, at some point, McCain said he was hungry, so she said they would go get something to eat; that she telephoned her mother, and they stopped by her mother’s place of employment to get some money; that, at some point, her son, who was at her mother’s house, telephoned her; that her son told her that McCain’s probation officer had just telephoned and was looking for him; that she told him McCain would be home in a minute; that her son telephoned her again and said that the probation officer said that, if McCain did not get back to the probation office within the next twenty minutes, they were going to issue a warrant for his arrest and send the sheriff out to pick him up; that they turned around, and she took McCain back to the probation office; that she asked McCain why they were bringing him back, and he said he did not know why; that she told him not to lie to her; and that McCain again told her that he did not know why. She also testified that she sat in the vehicle waiting for McCain; that, at some point, a marshal or someone else came outside and told her she needed to claim McCain’s things; that she went and signed for his things; and that she did not know what McCain was “going in” for because no one would tell her. (R. 27.)
 

 McCain testified that a man who told him his name was Edison had cut his grass on the Sunday before the incident in question; that Edison had cut his grass a couple of times; that he had not had any problems with Edison before that; that, between 8:00 p.m. and 9:00 p.m. on June 10, 2008, Edison came back to his house with a one hundred dollar bill and asked him if he could change it; that he said he could; that he went and got the money from Green; that he came back and exchanged the money; that he looked at the bill and thought it looked funny; that he asked Green if she believed the money was real; that Green looked at the money and said she believed it was real; and that he said, “[Ojkay,” and put it away. (R. 28.) He also testified that, on June 11, 2008, he went to the probation office; that he went to the desk to pay his $30 probation fee; that the woman “hit” the bill with the marker, held it up, “hit” it again, and said, “I don’t think this is real, son”; that he said, “ ‘[Wjhat?’ ” but he “kind of had the feeling”; that the woman told him the bill was not real and that she was going to have to call a probation officer to have it verified; that the woman called Koepp; and that he went and sat back down. (R. 29.) McCain further testified that Koepp came up and told him not to leave and that he needed to stay; that he left the probation office to get some money from his mother in case the bill was not real; that his mother worked at AmSouth Bank; that his sister took him to see his mother; and that he thought he needed to get money to pay his fees because he did not want to owe any money.
 

 McCain also testified that he had not ever been tested for marijuana; that he told his probation officer that, if tested, he would test positive for marijuana; that he
 
 *646
 
 did so because he did not want to make the situation worse; that he was smoking marijuana a couple of times a week at that time; that he knew that smoking marijuana was a violation of his probation; and that he regretted smoking marijuana.
 

 I.
 

 McCain argues that the circuit court abused its discretion when it revoked his probation.
 

 A.
 

 Initially, McCain contends that the circuit court erroneously found that he had violated his probation by using a counterfeit bill to pay his probation fee because the evidence did not clearly indicate that he had personal knowledge that the one hundred dollar bill was counterfeit.
 

 “ ‘The standard of proof in probation revocation hearings is not the same as that in a criminal trial. It is to the “reasonable satisfaction” rather than beyond a reasonable doubt or by a preponderance of the evidence.’
 
 Hall v. State,
 
 681 So.2d 251, 252 (Ala.Crim.App.1996), citing
 
 Ex parte Belcher,
 
 556 So.2d 366, 868-69 (Ala.1989).
 
 In Ex parte Caffie,
 
 516 So.2d 831 (Ala.1987), the Alabama Supreme Court stated:
 

 “ ‘ “ ‘There is no definite criterion or measure of proof necessary to justify the revocation of one’s probation.’
 
 Wright v. State,
 
 349 So.2d 124 (Ala.Crim.App.1977). The evidence need not ‘be strong enough to convince the court beyond a reasonable doubt that the probationer has violated a term of his probation,’
 
 Carter v. State,
 
 389 So.2d 601 (Ala.Crim.App.1980); it needs only to reasonably satisfy the court of the truth of the charge.
 
 Goodrum v. State,
 
 418 So.2d 942 (Ala. Crim.App.1982). Absent a gross abuse of discretion, the trial court’s ruling in a probation revocation will not be disturbed by this Court.
 
 Wright,
 
 supra.” ’
 

 “516 So.2d at 833-34, quoting
 
 Rice v. State,
 
 429 So.2d 686, 687 (Ala.Crim.App.1983).”
 

 Ewing v. State,
 
 826 So.2d 199, 203 (Ala.Crim.App.2001).
 

 At the conclusion of the revocation hearing, the circuit court stated:
 

 “As the fact finder I have to go by the same rules I tell the jury. Most importantly, you can’t leave your common sense at the door.
 

 “While on the one hand you would have to think what kind of an idiot would go to the probation office with a counterfeit hundred dollar bill.
 

 “And then, on the other hand, all of these new bills look funny to all of us. However, in using common sense and experience, and unfortunately, for this hearing, he’s got me who’s been around the block a few times. You’ve got somebody coming to the door at eight o’clock at night who he says has mowed his grass in the past, or recently did it, comes in and wants to swap a hundred for change. That’s suspicious. Two, when he’s caught with it the next morning as opposed to immediately saying, whoa, wait a minute, I had my suspicions about this, let me go get some real money or go get the real deal, he doesn’t. He leaves when they ask him to stay. He gets his sister who’s taking time out from her schedule to get him to the probation office, and my hat goes out to her trying to help him do the right thing, doesn’t tell her a thing, because my understanding from the testimony she gets a call later from [her son] saying you better get him back down to the probation office. When she says, ‘Why you got to go back? I don’t know.’ The sister didn’t testify he said let’s go
 
 *647
 
 to mama I’ve got to get some real money or this money may be fake. None of that.
 

 “And then, to add insult to injury, when he’s caught, he gives a couple of different stories to the secret service agent. This all, to me, adds up that he was trying to deceive everybody.”
 

 (R. 39-40.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the State presented sufficient evidence to reasonably satisfy the circuit court that McCain knew that the one hundred dollar bill he gave to the probation office was counterfeit. Accordingly, McCain’s argument is without merit.
 

 B.
 

 McCain also contends that the circuit court abused its discretion when it revoked his probation based solely on his admission that he had used marijuana and that, if tested, he would test positive for marijuana. Specifically, he asserts that the probation officer did not request a urine sample to verify his admission and that the probation office did not present any prior positive drug tests. However, McCain did not present this specific argument to the circuit court. Therefore, it is not properly before this court.
 
 See K.W.J. v. State,
 
 905 So.2d 17 (Ala.Crim.App.2004).
 

 C.
 

 McCain further contends that, because he had diligently reported to his probation officer and had never been asked to submit a drug test, the circuit court should have considered alternative measures before it revoked his probation. Initially, we note that, although he requested leniency during his arguments at the conclusion of the hearing, he never argued that the circuit court abused its discretion when it did not consider alternatives other than revoking his probation. Therefore, we question whether this argument is properly before this court.
 
 See K.W.J.,
 
 supra.
 

 Moreover,
 

 “[ajlthough Rule 27.6(d), Ala. R.Crim. P., provides that a trial court may ‘revoke, modify, or continue probation’ if it finds that a probationer has violated the terms and conditions of his probation, whether revocation and imposition of the original sentence or some other disposition is appropriate is a matter within the sound discretion of the trial court. Absent a clear abuse of discretion, a reviewing court will not disturb a trial court’s conclusions in a probation-revocation proceeding, including the determination whether to revoke, modify, or continue the probation. See, e.g.,
 
 Ex parte
 
 J.J.D., So.2d 240 (Ala.2000) (holding that a trial court’s order in a probation-revocation proceeding will not be reversed absent a clear abuse of discretion); and
 
 Moore v. State,
 
 432 So.2d 552, 553 (Ala.Crim.App.1983), quoting
 
 Wright v. State,
 
 349 So.2d 124, 125 (Ala.Crim.App.1977) (holding that ‘ “[o]nly a gross abuse of discretion will justify the reviewing court in disturbing the trial court’s conclusions” ’). A trial court abuses its discretion only when its decision is based on an erroneous conclusion of law or where the record contains no evidence on which it rationally could have based its decision. See
 
 State v. Jude,
 
 686 So.2d 528 (Ala.Crim.App.), cert. quashed, 686 So.2d 536 (Ala.1996), citing
 
 Dowdy v. Gilbert Eng’g Co.,
 
 372 So.2d 11 (Ala.1979).”
 

 Holden v. State,
 
 820 So.2d 158, 160 (Ala.Crim.App.2001).
 

 In this case, McCain told Koepp that he had smoked marijuana the day before he reported to his probation officer, that he would test positive for marijuana, and that he had smoked marijuana while
 
 *648
 
 he was in the custody of ADOC. Further, at the revocation hearing, McCain testified that he had been smoking marijuana a couple of times a week and that he knew that that was a violation of his probation. Finally, the State presented evidence that McCain tried to use a counterfeit one hundred dollar bill to pay his supervision fees. Therefore, this was not a case where the circuit court based its decision on an erroneous conclusion of law or where the record does not contain any evidence to support its decision. Accordingly, the circuit court did not abuse its discretion when it revoked McCain’s probation and reinstated his original sentence.
 

 II.
 

 McCain also argues that the circuit court did not adequately reflect how much time he had served. Specifically, he contends that
 

 “[tjhere is no specificity how much time had already been served or how this time is calculated. It was not indicated whether the defendant was given credit for the time he served in jail awaiting his probation hearing or whether his previous incarceration was used in the calculation. Therefore the sentence is ambiguous and could be potentially interpreted to impose a sentence greater than the original sentence.”
 

 (McCain’s brief at p. 18.) The State concedes that the record is not clear as to whether the circuit court credited McCain for the time he served during his minimum period of confinement; that the circuit court did not clearly indicate how much credit it was giving McCain for the time he spent incarcerated pending the revocation hearing; and that it appeared that the amount of credit the circuit court gave him for the time he was incarcerated pending the revocation hearing might be excessive. Therefore, the State asks that we remand this case for the circuit court to clarify the amount of credit McCain received for the time he was incarcerated while serving his minimum period of confinement and for the amount of time he was incarcerated pending the revocation hearing.
 

 Accordingly, we remand this case to the circuit court with instructions that it make specific, written findings of fact regarding the amount of credit McCain may have received for the time he spent incarcerated awaiting trial in this case, the amount of credit McCain received for the time he spent serving his minimum period of confinement, the amount of credit McCain received for the time he was incarcerated pending the revocation hearing, and its basis for determining those amounts. On remand, the circuit court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 42 days after the release of this opinion. The return to remand shall include a copy of the circuit court’s written order.
 

 REMANDED WITH INSTRUCTIONS.
 
 *
 

 WELCH, WINDOM, KELLUM, and MAIN, JJ., concur.
 

 *
 

 Note from the reporter of decisions: On September 25, 2009, on return to remand, the Court, of Criminal Appeals affirmed, without opinion.